## Dumont and others *v.* Fry, Trustee, and others.

*(Circuit Court, S. D. New York.  September 7, 1882.)*

1. Priority of Lien

The legal title to certain bonds being in C. & Son, bankers of New Orleans, with nothing to indicate the equitable interest of complainants therein, C. & Son, deposited said bonds with S. & Sons, bankers of New York, their correspondents and financial agents in that city, and afterwards C., who was also president of the New Orleans Banking Association, hypothecated a portion of said bonds to S. & Sons in behalf of the banking association to protect S. & Sons against any overdrafts to the extent of $100,000, that might from time to time arise in their dealings with said association. Subsequently C. & Son, the New Orleans National Banking Association, and S. & Sons, failed, and made assignments to trustees in bankruptcy. *Held*, that the trustee in bankruptcy of S. & Sons had a lien on said bonds to the extent of $100,000 for the unpaid balance due them from the New Orleans Banking Association, and also a bankers' lien on those not so pledged for the amount of the balance of account due them from C. & Son, and that such liens were first to be satisfied out of the interest of C. & Son in the bonds as between that firm and the complainants.

2. Equitable Interest—Attachment.

Complainants being the equitable owners of a moiety of the bonds in suit, subject, however, to the lien of C. & Son, for any balance existing in their favor in the account relating to the joint purchase of the bonds with the com-

plainants, the trustee could acquire a valid lien by virtue of an attachment upon the interest of complainants for the sum which may ultimately be recovered in his suit against complainants.

3. PRACTICE—ACCOUNTING BY TRUSTEE.

In such a case the trustee must account for the amount of all coupons collected.

4. SAME,—REFERENCE TO MASTER—RECEIVER—COSTS.

Where the extent of respective interests of the parties can be arrived at without a reference to the master, such reference may be dispensed with upon counsel filing a stipulation to that effect. Under the circumstances the decree will provide for appointment of a receiver to sell the bonds, and to distribute the proceeds to the parties according to their respective rights. Costs will be allowed to the trustee.

*Edgar A. Hutchins*, for complainants.

*Man & Parsons*, and *Platt, Gerard & Bowers*, for defendants.

WALLACE, C. J. Upon the proofs the complainants are the equitable owners of a moiety of the $275,000 of the negotiable bonds in suit, subject, however, to the lien of Cavaroc & Son for any balance existing in their favor in the account relating to the joint purchase of the bonds with the complainants. As the legal title to the bonds was in Cavaroc & Son, with nothing to indicate the equitable rights of the complainants, the bonds are subject also to the liens acquired upon them by Schuchardt & Sons, through their dealings with Cavaroc & Son. The present controversy mainly involves the question as to the character and extent of these liens. During the period covered by the transactions in controversy, Schuchardt & Sons were bankers at the city of New York, and were the correspondents and financial agents there of Cavaroc & Son, bankers of New Orleans, and also of the New Orleans National Banking Association of the same city. At the same time the senior member of Cavaroc & Son was the president of the said banking association. The bonds in suit were intrusted by Cavaroc & Son to Schuchardt & Sons, in September, 1870, for the convenience of the former, and in order to facilitate the financial transactions between the parties. On various occasions Schuchardt & Sons obtained loans for Cavaroc & Son, and for the banking association, upon the security of the bonds. On one occasion Schuchardt & Sons loaned Cavaroc & Son $100,000, on the security of the bonds. While there is some evidence that the bonds were kept with Schuchardt & Sons merely as convenient depositories for Caravoc & Son, the fact that they were so frequently hypothecated by the former for the financial transactions of the latter, with their concurrence, indicates quite satisfactorily that they were placed and kept by Cavaroc & Son with Schuchardt & Sons as avail-

able securities for the financial exigencies arising from time to time between the parties. The bonds having thus been intrusted to Schuchardt & Sons, in the absence of any special understanding to the contrary, they acquired a banker's lien upon them, except as to those expressly hypothecated for the benefit of the banking association, and as to which the more difficult question arises.

The New Orleans Banking Association dealt largely in foreign bills of exchange, which it negotiated through Schuchardt & Sons. By the course of business, the amount of the foreign bills remitted from time to time by the banking association to Schchuardt & Sons was credited by the latter to the former, and the latter drew upon the former from time to time as funds were required by it. If, as sometimes happened, the bills which had been remitted and credited were not paid by the parties primarily liable upon them, they were charged back by Schuchardt & Sons to the banking association, monthly statements of account being rendered between the two banking concerns. It is in evidence that by the custom of business at New Orleans advances are made by bankers to shippers in anticipation of the actual delivery of the bills and accompanying documents, and the banking association was consequently necessitated to advance funds for that purpose before it could remit the bills and be credited by Schuchardt & Sons with their amount. In order to assist the banking association in this behalf, and undoubtedly for the mutual profit of both concerns, at times the banking association had been permitted by Schuchardt &'Sons to draw in advance of remittances. December 4, 1871, such an overdraft was authorized to the extent of $100,000, upon the condition that the drafts should represent exchange actually bought and paid for. The transactions between the banking concerns were large, being sometimes over a million of dollars daily.

These being the relations and course of business between the two concerns, a hypothecation of the bonds to Schuchardt & Sons was made by one of the Cavarocs for the benefit of the New Orleans Banking Association in February, 1873, and the important question in this controversy is concerning the true construction and meaning of that hypothecation. The hypothecation arises from the following correspondence, conducted in the French language. February 6th, 1873, the cashier of the banking association wrote to Schuchardt & Sons:

"Are we still authorized to draw *a decouvert* $100,000 against purchases of exchange advised by wire."

February 11, 1873, Schuchardt & Sons replied:

"The credit of $100,000 *a decouvert* was predicated upon the deposit of New Orleans city bonds, and on their withdrawal we supposed the agreement canceled."

February 15, 1873, the cashier of the banking association answered:

"Your letter of December 4, 1871, authorized us to draw in advance of remittance to the extent of $100,000, represented by purchases of exchange advised by telegraph. There was no mention of a deposit of city bonds to guaranty such overdraft, and we have been acting ever since under the impression that the credit was still in force. We now note that it is canceled, and beg leave to refer you to the private letter of our president upon the subject."

On the same day C. Cavaroc, the president of the banking association, wrote Schuchardt & Sons, referring to their letter of the 11th instant:

"I authorize you to consider a portion of the bonds belonging to my firm, which you have in your possession, as collateral security *en cas de decouvert*."

February 27, 1873, Schuchardt & Sons wrote to the cashier of the banking association:

"In reply to your president's letter of the 15th instant, we take pleasure in authorizing you, in accordance with the terms therein stated, to draw on us *a decouvert* for a sum not exceeding as maximum $100,000, against exchange purchases."

The New Orleans Banking Association failed on the fourth day of October, 1873, as did also Cavaroc & Son. At the time of the failure Schuchardt & Sons had $232,000 of the bonds in controversy in their possession, and there was due from the banking association to them $4,121.92 in excess of remittances; and there subsequently resulted, by reason of the non-payment of drafts and bills, which had been remitted by the banking association and credited to it, but charged back to its account because uncollectible, the sum of $195,-315.63. Upon the account between Schuchardt & Sons and Cavaroc & Son a debit balance arose against Cavaroc & Son of $7,454.22. Subsequently Schuchardt & Sons failed.

It is now insisted by the defendant Fry, who is the trustee in bankruptcy of Schuchardt & Sons, that the bonds thus held by them are subject, not only to a bankers' lien, for their benefit, for the indebtedness of Cavaroc & Son, but also, to the extent of $100,000, were hypothecated, under the terms of the correspondence referred to, to secure Schuchardt & Sons for the payment of all advances made by

them to the New Orleans National Banking Association. On the other hand, it is insisted by the complainants, and by the assignees in bankruptcy of Cavaroc & Son, that the hypothecation simply contemplated securing Schuchardt & Sons to the extent of $100,000 in advance of transmission to them of exchange; and, to the extent that bills of exchange were transmitted, the terms of the hypothecation were satisfied, although the exchange proved uncollectible.

Some obscurity exists as to the just interpretation of the agreement, because the correspondence is in a foreign language, and the meaning of the term "*a decouvert*" is not entirely clear. On the one hand it is claimed to mean "unsecured," and on the other to mean "uncovered." But, reading the correspondence in the light of surrounding circumstances, it is not difficult to conclude that the hypothecation should be construed as intended to protect Schuchardt & Sons for any overdraft that might arise in the course of the transactions between the two banking concerns to the extent of $100,-000. The bonds were evidently to be a continuing security until some new arrangement should be made. That they were to be security for an overdraft, in the ordinary meaning of that term as used between bankers, may be gathered from the correspondence. In his letter of February 15th the cashier of the banking association indicates such to be his understanding, and speaks of overdraft and drafts in advance of remittance as convertible terms. The correspondence also indicates clearly that the terms "*a decouvert*" and "overdraft" are synonymous. When the cashier asked permission to draw "*a decouvert*," and is answered by Schuchardt & Sons that the credit "*a decouvert*" was predicated upon the security of the bonds, the cashier replies that he had not understood the bonds were ever deposited to guaranty such "overdraft." Assuming that the language of the pledge is that the bonds were to be a security, to the extent of $100,000, for any uncovered balance due from the banking association to Schuchardt & Sons, that uncovered balance must be held to mean any existing overdraft which might from time to time arise. Whether at any time there was an overdraft, could only be ascertained from the accounts of the parties. As it had been their custom to debit the banking association with all remittances uncollected, the amount of such uncollected remittances became a part of the general debit balance. The amount of the overdraft from time to time could not be ascertained except by ascertaining the general debit balance against the banking association, which de-

pended, to a greater or less extent, upon the items charged back to it for uncollected exchange.

Cogent evidence of the understanding of the banking association, and of C. Cavaroc himself, that the bonds were pledged as security for an overdraft arising in part from uncollected remittances, is found in the resolution of the directors of the banking association, adopted September 20, 1873, Cavaroc himself being present, which is as follows:

"Resolved, that with a view of securing the president against any eventual loss for the 232 city of New Orleans bonds belonging to the firm of C. Cavaroc & Son, and actually pledged to S. Schuchardt & Sons as collateral security for the payment of all foreign exchange bills sent them for negotiation, and by them indorsed, that he be and is hereby authorized to select as guaranty from the portfolios of the bank such papers as he may think proper, to the extent of $100,000."

This statement is entirely inconsistent with the theory that the uncovered balance which the bonds were intended to secure was anything more or less than an ordinary overdraft. In short, it is evident from the relations of the parties, their course of business, the correspondence between them, and the construction placed upon the transaction by Cavaroc himself, that the bonds were pledged to secure Schuchardt & Sons for any overdrafts of the banking association, to the extent of $100,000, which might from time to time arise. Such overdrafts were the credit "*a decouvert*" contemplated by the parties, and constitute the unpaid balance of account due from the banking association to Schuchardt & Sons.

The conclusion is therefore reached that to the extent of $100,-000 the defendant Fry, as trustee for Schuchardt & Sons, has a lien upon the bonds for the unpaid balance of the account of the New Orleans National Banking Association. In ascertaining this balance the sum on deposit with, or collected by, the Union Bank of London is to be deducted; and, as the receiver of the Louisiana National Bank has not answered, it is to be adjudged that he has no interest in the fund arising therefrom. The defendant Fry has also a lien upon the bonds to the amount of the balance of account due from Cavaroc & Son to Schuchardt & Sons. The bonds having been left by Cavaroc & Son with Schuchardt & Sons, without any special agreement, except the pledge of a portion of them for the New Orleans Banking Association, those not thus pledged are subject to the bankers' lien of Schuchardt & Sons. The liens of Fry are first to be satisfied out of the interest of Cavaroc & Sons, in the bonds as between

that firm and the complainants. Fry has also a lien by virtue of his attachment upon the interest of the complainants for the sum which may ultimately be recovered in the suit against the complainants. Of course, Fry must account for the amount of all coupons collected. It is understood from the statements of counsel that the rights of the parties being adjudged, the extent of their respective interests can be arrived at without a reference to a master. Upon filing a stipulation a reference will, therefore, be dispensed with; otherwise, a reference will be directed. Unless the parties otherwise stipulate, the decree will provide for the appointment of a receiver to sell the bonds and distribute the proceeds to the parties according to their respective rights. The defendant Fry is entitled to costs.